# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

IN RE:  NORTHWEST AIRLINES
CORP., *et al.* ANTITRUST
LITIGATION

 

THIS DOCUMENT RELATES TO:
All Actions

Master File No. 96-74711
Hon. Gerald E. Rosen

<u>CLASS ACTION</u>

# NORTHWEST'S AND DELTA'S RENEWED MOTION
# FOR SUMMARY JUDGMENT

Defendants Northwest Airlines Corporation, Northwest Airlines, Inc. and Delta Air Lines, Inc. ("Defendants"), by and through their attorneys, respectfully request that this Court grant summary judgment in their favor on plaintiffs' claims under section 2 of the Sherman Act. In support of this motion, Defendants rely on the arguments contained in the attached brief in support.  Counsel for Defendants has conferred with counsel for Plaintiffs regarding the relief sought in this motion but has been unable to obtain concurrence in the relief sought.

Respectfully submitted,

DICKINSON WRIGHT PLLC

By:___s/Brian M. Akkashian_____
    Lawrence G. Campbell (P11553)
    Brian M. Akkashian (P55544)
500 Woodward Avenue, Suite 4000
Detroit, MI  48226
(313) 223-3500
Attorneys for Defendants
Northwest Airlines Corporation and
Northwest Airlines, Inc.

James P. Denvir
Scott E. Gant
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W., Suite 800
Washington, D.C.  20015
(202) 237-2727
Attorneys for Defendants
Northwest Airlines Corporation and
Northwest Airlines, Inc.

Emmet J. Bondurant
Frank M. Lowrey IV
BONDURANT MIXSON & ELMORE LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, GA  30309
(404) 881-4100
Attorneys for Defendant Delta Air Lines, Inc.

David A. Ettinger
Howard Iwrey
HONIGMAN MILLER SCHWARTZ &
COHN
2290 First National Building
Detroit, MI  48226
(313) 465-7368
Attorneys for Defendant Delta Air Lines, Inc.

Dated:  April 29, 2005

2

I hereby certify that on April 29, 2005, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: _____ n/a _____ and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants: ___ Bruce E. Gerstein, Esq. and Elwood S. Simon, Esq..

s/Brian M. Akkashian (P55544)
DICKINSON WRIGHT PLLC
500 Woodward Avenue, Suite 4000
Detroit, Michigan  48226
(313) 223-3500
bakkashian@dickinsonwright.com

DETROIT 22270-11 874319

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

IN RE:  NORTHWEST AIRLINES
CORP., *et al.* ANTITRUST
LITIGATION

)
)
)
)
)
)
)
)
)
)
)

Master File No. 96-74711
Hon. Gerald E. Rosen

THIS DOCUMENT RELATES TO:
All Actions

<u>CLASS ACTION</u>

# BRIEF IN SUPPORT OF NORTHWEST'S AND DELTA'S RENEWED MOTION
# <u>FOR SUMMARY JUDGMENT</u>

## ISSUE PRESENTED

Whether the defendants are entitled to summary judgment on plaintiffs' claims under Section 2 of the Sherman Act because their respective prohibitions on hidden city ticketing do not constitute anticompetitive conduct, as required to establish a violation of Section 2.

# <u>TABLE OF AUTHORITIES</u>

*Action Towing & Rental v.U-Haul Int'l* 507 F.Supp. 987, 992 (E.D. La. 1981) .................6

*Ad-Vantage Tel. Director Consultants, Inc. v GTE Directories Corp.*, 849 F.2d 1336,
   1346 (11th Cir. 1987).........................................................................................6

*Aspen Skiing Co. v Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985).............3

*Byars v. Bluff City News Co.*, 609 F.2d 843, 853 6th Cir. 1978)...........................................3

*Chase v. Nortrhwest Airlines Corp.*, 49 F.Supp.2d 553, 565 (E.D. Mich. 1999).................2

*Compuware Corp. v. IBM*,  259 F.Suppp. 2d 597, 602-03 (E.D. Mich. 1999).....................15

*Continental Cablevision of Ohio, Inc. v American Elec. Power Co.*, 715 F.2d 1115, 1120
   *(6th Cir. 1983)* .................................................................................................3

*Eckard Brandes, Inc. v. Riey*, 338 F.3d 1082, 1085 (9th Cir. 2003).......................................6

*Glen Eden Hosp., Inc. v. Blue Cross & Blue Shield of Michigan, Inc.*, 740 F.d 423,430
   (6th Cir. 1984).....................................................................................................18

*Graphic Products Distributors, Inc. v. Itek Corp.*, 717 F.2d 1560 (11th Cir. 1988).............13

*Illinois Corporate Travel v. American Airlines, Inc.* 889 F.2d 751, 753 (7th Cir. 1989).......5

*Kerasotes Michigan Theatres, Inc. v. National Amusements, Inc.*, 854 F.2d 135 (6th
   Cir. 1988) ...........................................................................................................15

*Lerma v. Univision Communications, Inc.* , 52 F.Supp. 2d 1011, 1019 (E.D. Wis. 1999)....3

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) ..............16

*Ozark Heartland Elects., Inc. v Radio Shack*, 278 F.3d 759, 763 (8th Cir. 2002) ................7

*Paschall v. Kansas City Star Co.*, 727 F.2d 692 (8th Cir. 1984)...........................................14

*Pogue v. International Indus., Inc.*, 524 F.2d 342, 345 (6th Cir. 1975) ................................7

*Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568 (6th Cir. 1986) ...................................7,9

*Ryko Mfg. Co. v. Eden Services*, 823 F.2d 1215, 1222-23 (8th Cir. 1986)............................9

*Smith v. Northern Mich. Hosps.*, 703 F.2d 942, 950 (6th Cir. 1983)..................................9

*Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1087 (6th Cir. 1983) .............17

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993) .............................................15

*Spirit Airlines, Inc. v. Northwest Airlines, Inc.* Case No. 00-71535, March 31, 2003 .........17

*United States v. General Electric Co.*, 272 U.S. 476, 488 (1926) .........................................6

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP,*
    540 U.S. 398 (2004)...................................................................................................2

*Walker v. U'Haul Co. of Mississippi*, 734 F.2d 1068, 1071 (5th Cir. 1984).........................6

**Other Authorities**

3 P. Areeda & D. Turner, Antitrust Law 78 (1978) ................................................................3

3 Philip E. Areeda & Herbert Hovenkamp, Antitrust Law 78 (2d ed. 2002) ........................1

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................1

II.   ARGUMENT AND CITATION OF AUTHORITY ..........................................2

    A.    A Monopolization Claim Requires Proof of Conduct That Impairs the Opportunities of Rivals to Compete in the Relevant Market...............................2

    B.    Hidden City Rules Cannot Constitute Exclusionary Conduct on the Theory that They Preclude Intrabrand Competition..........................................................4

        1.    There is No Intrabrand Competition Between An Airline and Travel Agents as to Terms and Conditions of Sale of that Airline's Tickets.................................................................................................5

        2.    Because a Monopolist May Lawfully Charge a Monopoly Price, an Airline's Refusal to Allow Hidden City "Discounts" Cannot Be Exclusionary Conduct. ............................................................................10

        3.    The Vertical Restraint Caselaw Does Not Support Plaintiffs' Position. ..........................................................................................12

        4.    The Vertical Integration Cases Do Not Support Plaintiffs' Position......13

III.  HIDDEN CITY RULES CANNOT CONSTITUTE EXCLUSIONARY CONDUCT ON THE THEORY THAT THEY PRECLUDE INTERBRAND COMPETITION. .................................................................................................15

    A.    Monopoly Leveraging......................................................................................15

        1.    Leveraging from Spoke-Hub to Spoke-Spoke Markets..........................15

        2.    Leveraging from Spoke-Hub to Spoke-Spoke to Spoke-Hub.................17

        3.    Price Discrimination. ..........................................................................18

IV.   CONCLUSION..................................................................................................19

# I.   **INTRODUCTION**

This renewed summary judgment motion raises a single issue – whether defendants' respective tariff rules prohibiting hidden city ticketing can constitute exclusionary conduct, an essential element of plaintiffs' claims under Sherman Act, Section 2.  Defendants are, of course, aware that the Court has previously ruled on this issue in denying Northwest's motion to dismiss and defendants' motion for summary judgment.  However, the Court observed that its analysis was "undertaken with little assistance from the parties," that "neither side has provided much assistance in this analysis," and, in particular, that the defendants had not addressed the Court's earlier conclusion "that anticompetitive conduct directed at the intrabrand level alone can, in the proper circumstances, sustain a § 2 claim."  May 16, 2002 Order ("Order") at 72, 76, 87.

Defendants respectfully request that the Court entertain this renewed motion for summary judgment, which focuses directly on the intrabrand theory discussed in the Court's prior orders and also addresses the possible interbrand effects of each airline's tariff rule prohibiting hidden city ticketing discussed in the Court's summary judgment order.   In support of this motion, defendants will show that:

- Hidden city rules lack "[a] sine qua non of anticompetitive conduct . . . that it enlarges (or preserves) the defendant's market power at the expense of rivals";[1]

- Even if restraints on intrabrand competition alone can support a Section 2 claim, as a matter of law there is no intrabrand competition between an airline and travel agents as to the price or other terms and conditions of sale of that airline's tickets.  For the same reason that it is lawful *per se* for a principal to dictate the exact terms on which its sales agents sell its services, a principal may lawfully forbid its agents from deviating from those terms;

- An airline's refusal to allow its agents or employees to sell hub-spoke travel at fares lower than the one published for that origin and destination cannot be unlawful anticompetitive conduct, even if the hub-spoke fare is a monopoly fare, because it is lawful *per se* for a monopolist to charge a monopoly price; and

---

[1] 3 Philip E. Areeda & Herbert Hovenkamp, Antitrust Law 78 (2d ed. 2002).

- A hidden city rule does not become exclusionary even if, as plaintiffs claim, airlines once allowed or encouraged travel agents to sell hidden city tickets. Eliminating a discount cannot be any more unlawful than simply raising price, which is perfectly lawful for a monopolist, even if it raises the price to a monopoly level.

Defendants further submit that the Supreme Court's recent decision in *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) suggests that reconsideration would be appropriate, both for its substantive ruling, which is contrary to part of the Court's rationale for denying summary judgment, and for its general warning against "an undue expansion of § 2 liability" due to "[t]he cost of false positives." 540 U.S. at 414. Imposing treble damages liability based on a rule that dictates the terms and conditions on which an agent may bind the principal to a contract for the principal's services would make new law that greatly expands the reach of Section 2. Defendants respectfully request that, before conducting a lengthy monopolization trial based on this premise, the Court consider the additional arguments set forth in this renewed motion.[2]

## II.    ARGUMENT AND CITATION OF AUTHORITY

### A.    A Monopolization Claim Requires Proof of Conduct That Impairs the Opportunities of Rivals to Compete in the Relevant Market.

Under Sherman Act, Section 2, the elements of monopolization are: "1) the possession of monopoly power in the relevant market; and 2) the willful acquisition, maintenance, or use of that power either by anti-competitive or exclusionary means." *Chase v. Northwest Airlines Corp.*, 49 F. Supp. 2d 553, 565 (E.D. Mich. 1999).

---

[2] If the Court is not inclined to grant this motion, defendants have submitted an alternative motion requesting that the Court certify for interlocutory review the part of its May 16, 2002 order addressing the issue raised in this motion and/or a new order addressing the issue.

A necessary, but not sufficient characteristic of anticompetitive conduct is that it impairs the opportunities of rivals to compete.  Exclusionary conduct is "'behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way.'"  *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985) (quoting 3 P. Areeda & D. Turner, Antitrust Law 78 (1978)). As Professors Areeda and Hovenkamp explain, "[a] sine qua non of anticompetitive conduct is that it enlarges (or preserves) the defendant's market power at the expense of rivals. Thus, the first requirement for exclusionary conduct is injury to rivals.  Exclusionary behavior must be conduct that prevents actual or potential rivals from competing or which impairs their opportunities to do so effectively."  3 Areeda & Hovenkamp, Antitrust Law 78 (2d ed. 2002).[3]

Importantly, a monopolist does not engage in anticompetitive or exclusionary conduct by charging a monopoly price for its goods or services.  To the contrary, the Supreme Court recently emphasized that "[t]he mere possession of monopoly power, and the concomitant charging of monopoly prices is not only not unlawful; it is an important element of the free-market system. The opportunity to charge monopoly prices – at least for a short period – is what attracts 'business acumen' in the first place; it induces risk taking that produces innovation and economic growth."  *Trinko*, 540 U.S. at 407.

Nor is it anticompetitive or exclusionary for a monopolist to raise or maintain the price at

---

[3] *Accord Byars v. Bluff City News Co.*, 609 F.2d 843, 853 (6th Cir. 1978) ("[I]f a monopolist abuses its monopoly power and acts in an unreasonably exclusionary manner *vis-à-vis rivals or potential rivals*, then § 2 is violated.") (emphasis added); *Continental Cablevision of Ohio, Inc. v. American Elec. Power Co.*, 715 F.2d 1115, 1120 (6th Cir. 1983) ("It is the use of monopoly power 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor' that is unlawful."); *Lerma v. Univision Communications, Inc.*, 52 F.Supp. 2d 1011, 1019 (E.D. Wis. 1999) ("Anticompetitive or exclusionary conduct 'impairs the opportunities of rivals and is neither "competition on the merits" nor more restrictive than reasonably necessary for such competition.'") (quoting 3 Areeda &. Hovenkamp, Antitrust Law ¶ 650a (rev. ed.1996)).

which others sell its goods or services – to the contrary, charging a high price makes it easier for rivals to enter a market and compete effectively with the alleged monopolist:

> Take, for example, a case in which a monopolist has imposed minimum resale price maintenance agreements on it distributors.  Such agreements have long been per se unlawful under § 1, but they do not create or enhance the monopolist's market power by curtailing the opportunities of its actual or potential competitors.  If anything, the higher retail prices on the monopolist's goods enhance their competitors' opportunities.

3 Areeda & Hovenkamp, at 86; *see also* 3A Areeda & Hovenkamp, at 46 ("the elimination of competition among retailers in the resale of the monopolist's product does not impair the opportunities of actual or potential rivals.  If anything, it improves their opportunities.").

In sum, to prove that a hub carrier's hidden city rule constitutes anticompetitive conduct for purposes of Section 2, plaintiffs must prove that it impairs the ability of rivals to compete in the relevant market, not merely that hub-spoke fares are supracompetitive.  However, plaintiffs cannot prove this based either on the theory that they advanced in summary judgment briefing (that hidden city rules exclude price "competition" by travel agents) or on their unsupported suggestions at oral argument that hidden city rules have interbrand effects.

### B.   Hidden City Rules Cannot Constitute Exclusionary Conduct on the Theory that They Preclude Intrabrand Competition.

For good reason, plaintiffs did not claim in their summary judgment briefing that an airline's hidden city rule impairs the ability of other airlines to compete in the allegedly relevant hub-spoke markets.  Order at 72-73 (summarizing plaintiffs' position). If, as plaintiffs contend, a hidden city rule effectively raises the fare that the hub carrier charges in the hub-spoke market, that would not in any way impede rivals from offering competing service in that market.  To the contrary, that would tend to enhance (and certainly not impede) a rival airline's ability to finance entry or expansion of service.

Instead, plaintiffs claim that the "rivals" excluded by the defendants' hidden city rules are

4

the travel agents that the defendants have appointed to act as authorized sales agents on their behalf in airline ticketing transactions.   Order, at 72-73 ("'In the absence of Defendants' conspiracy and monopolization, it is the travel agents/agencies who would 'enter the market' to 'compete' with Defendants, by actively publicizing and selling hidden-city, back-to-back and similar types of tickets . . . .") (quoting plaintiffs' interrogatory responses).[4]   For several reasons, plaintiffs cannot satisfy the second element of a Section 2 claim based on this theory.

1.   **There is No Intrabrand Competition Between An Airline and Travel Agents as to Terms and Conditions of Sale of that Airline's Tickets.**

"[S]o-called 'intrabrand' restraints, which include resale price maintenance and vertical nonprice restrictions, are generally irrelevant for Sherman Act § 2 purposes, because they do not impair the competitive opportunities of rivals." 3A Areeda & Hovenkamp, at 45-46.  However, for purposes of this motion, this Court need not decide whether restrictions on intrabrand competition could ever constitute exclusionary conduct for purposes of a Section 2 claim.  That issue is not presented by this case because there is no intrabrand competition between an airline and travel agents with respect to the price or other terms and conditions that apply to the air transportation that the agency is selling on the carrier's behalf.

Travel agents are true sales agents, bound by contract and law to sell the airline's services only at the prices and on the terms and conditions allowed by the airline.  "Travel service operators are 'agents' for purposes of antitrust law when they sell tickets for air carriers' accounts." *Illinois Corporate Travel v. American Airlines, Inc.*, 889 F.2d 751, 753 (7th Cir. 1989).  "They carry no inventory and can book space only by requesting it from the carrier's

---

[4]  At the motions hearing, plaintiffs suggested ways in which the hidden city rule might affect interbrand competition between airlines.  Defendants address those points below.

computer; air carriers set the price for each ticket (sometimes changing the allocation of seats among price and travel-date-restriction categories by the hour), produce the service, deliver it direct to travelers, and take the risk of unsold seats." *Id.* at 752; *see also Chase*, 49 F. Supp. 2d at 555 n.2.

True sales agents (in contrast to distributors who purchase and resell the defendant's products) are not intrabrand competitors for the purposes of the antitrust laws.[5]  Indeed, "'an agent is subject to a duty not to compete with the principal concerning the subject matter of his agency.'" *Eckard Brandes, Inc. v. Riley*, 338 F.3d 1082, 1085 (9th Cir. 2003) (quoting Restatement (Second) of Agency, § 393).  That is why it is lawful *per se* for a manufacturer to dictate the exact price, terms and conditions on which its sales agents sell its goods, even though that would be illegal *per se* as between a manufacturer and a reseller.  The Supreme Court's decision in *United States v. General Electric Co.*, 272 U.S. 476, 488 (1926) established that the "owner of an article, patented or otherwise, is not violating the common law, or the Anti-Trust law, by seeking to dispose of his article directly to the consumer and fixing the price by which his agents transfer the title from him directly to such consumer."  As reflected by *General*

---

[5]  *See, e.g., Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*, 849 F.2d 1336, 1346 (11th Cir. 1987) ("there can be no antitrust violation without a competitor, and agents do not compete with those whom they represent"); *Action Towing & Rental v. U-Haul Int'l*, 507 F. Supp. 987, 992 (E.D. La. 1981) ("Plaintiff's contention that U-Haul's action in terminating it tended to eliminate retail price competition among U-Haul rental agents fails to support a claim that intrabrand competition has been affected.  Plaintiff had no legal or contractual right to compete with respect to prices with other U-Haul dealers or moving centers because U-Haul had the legal right to fix the rates at which plaintiff rented U-Haul equipment.  Thus there is no legally protected price competition among U-Haul agents that could be lessened by the termination of Action Towing."), *aff'd*, 683 F.2d 415 (5th Cir. 1982); *Walker v. U-Haul Co. of Mississippi*, 734 F.2d 1068, 1071 (5th Cir. 1984) ("Walker, as a U-Haul franchisee, was not in a position to set prices; that was done by U-Haul.  He was essentially an agent for U-Haul, and the substitution of a salaried agent for one who, like Walker, worked on commission could not possibly have had any effect on intrabrand competition, let alone a significant effect.").

*Electric* and the decisions that follow, agreements by which a principal controls the exact terms on which an agent sells its goods are not analyzed even under the rule of reason. They are as lawful as similar restrictions imposed on the defendant's internal employees. *See, e.g., Illinois Corporate Travel*, 889 F.2d at 753-54 ("Because travel service operators are the air carriers' agents, the requirement to refrain from advertising a lower price is lawful per se, just as the obligation is lawful when fastened on one's employees.").[6]

It follows that rules forbidding travel agents from charging different fares than those authorized by the airline for the passenger's itinerary and date of purchase cannot restrict intrabrand competition, any more than similar rules imposed on the airline's employees. This is true whether the rule at issue forbids the sale of certain discounted tickets to those who do not purchase in advance, prohibits the sale of spoke-spoke tickets to those who intend to use them to travel from spoke to hub, or simply bars the agent from selling at a different price than the published fare. All of these restrictions have the same purpose and effect – to prevent the travel agent from charging a fare different than the one intended and authorized by the airline for the passenger's itinerary and date of purchase. However, that is perfectly lawful under *General Electric* and the cases that follow. Since the principal has the right to dictate the price and terms and conditions at which the agent sells the principal's goods or services, neither having nor enforcing rules that forbid the agent from selling at an unauthorized price could be unlawful.

---

[6] *See also Pogue v. International Indus., Inc.*, 524 F.2d 342, 345 (6th Cir. 1975) (franchisor could dictate price at which "true agent" sold the franchisor's goods); *Ozark Heartland Elects., Inc. v. Radio Shack*, 278 F.3d 759, 763 (8th Cir. 2002) (rejecting vertical price fixing claim because agent "neither bought nor resold" service and was not "an independent businessman who bears most or all of the risks on transactions with purchasers"); *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1222-23 (8th Cir. 1986) (manufacturer's sales agent was not "a separate economic entity"); *accord Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568 (6th Cir. 1986) (officers or agents of defendant do not constitute separate entities for antitrust purposes).

Hidden city rules, advance purchase requirements and so forth are no more exclusionary than the fact that the carrier sets the fares for its services in the first place and requires that its agents sell only at those fares, rather than at some discounted fare of the agent's own choosing. If the antitrust laws gave travel agents the right to disregard a carrier's instructions by selling hidden city tickets, then there is no principled reason why an agent would not have the right to sell the airline's tickets at any fare the agent chose, regardless of the carrier's wishes. That sort of "competition" between the agent and the carrier is obviously not permitted, because the agent is not an independent distributor who has paid the carrier in full for the air transportation and now seeks to resell it at its own risk. It is simply selling the carrier's services, as an agent for the carrier, binding the carrier to a ticket contract with the passenger, collecting money for the sale from the passenger, and then remitting those funds to the carrier.

In its summary judgment order, the Court noted that the agency principle discussed above is most typically raised in conspiracy cases brought under Section 1 and that, "under § 2, Plaintiffs need not identify a separate entity with which the Airlines are capable of conspiring." Order at 80. Although it is certainly true that unilateral conduct can violate Section 2, these agency cases are nonetheless directly relevant to the question of whether a principal's restrictions on actions by its agent could violate Section 2. That is because "[t]he implicit assumption behind all these cases [following *General Electric*] is there can be no antitrust violation without a competitor, and agents do not compete with those whom they represent." *Ad-Vantage Telephone Directory Consultants, Inc. v. GTE Directories Corp.*, 849 F.2d 1336, 1346 (11th Cir. 1987) (discussing *General Electric* and other Section 1 cases); *see also* note 5 *supra*.

The reason that principals and agents cannot conspire is that, within the scope of the agency, the agent does not constitute "a separate economic entity." *Ryko Mfg. Co. v. Eden*

8

*Services*, 823 F.2d 1215, 1222-23 (8th Cir. 1986).   The Sixth Circuit made this point in explaining the rationale for the rule that a corporation and its agents cannot conspire:

> It is well settled that "officers or employees of the same firm do not provide the plurality of actors imperative for a § 1 conspiracy." [*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984); *see Smith v. Northern Mich. Hosps.*, 703 F.2d 942, 950 (6th 1983)]   *The rationale is that officers or agents of a single firm share a unity of economic purpose with the firm, so that agreements, combinations or concerted actions among them do not impermissibly coalesce economic power that was previously directed toward divergent goals.*

*Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568 (6th Cir. 1986) (emphasis added).   If the interests of principals and agents are so aligned under the law that they cannot conspire, then they are necessarily so aligned that they cannot compete.

In *Advantage*, the Eleventh Circuit held that this same principle bars a Section 2 claim premised on the theory that a principal and its sales agents engage in intrabrand competition in the sale of the principal's goods.   849 F.2d 1336.   The Court sustained a directed verdict on a monopolization claim that was based on the allegation that a yellow page publisher competed with the sales agents who, along with the publisher itself, sold advertising space in the publisher's book.   Those sales agents did not compete with the publisher in any intrabrand market for sales of advertisements in the publisher's book because they were true sales agents. Absent a wholesaler-retailer relationship between the publisher and its sales agents, "[the plaintiff's] claims must fall, because it is not a lawful competitor of [the publisher]." *Id.* at 1344.

In its summary judgment Order, the Court suggested that a travel agent is "arguably capable of conspiring with or competing against" any particular airline because it has duty to assist its customers in identifying the lowest fare offered by any carrier.   Order at 80.   But finding the best deal available is not the same thing as selling a ticket at an unauthorized fare. Whatever the agent's duties to the passenger may be, it has no more right to violate an airline's

hidden city rule than to violate an airline's advance purchase requirement or to simply sell that airline's services at any other arbitrarily discounted fare of the agent's choosing. Moreover, if the fact that travel agents act for multiple parties makes them capable of conspiring or competing with their airline principals, this would affect many other types of agents that have heretofore been bound to sell only at the price and on the terms authorized by the principal:

> Although each travel service operator (conventionally called a "travel agent," a telling phrase) works with many airlines, hotel chains, and other suppliers of travel services, this is a common form of organization. Real estate agents work for many clients, and multiple-listing services allow many agents access to the same properties; auction houses sell works of art furnished by hundreds of owners at a single sitting.

*Illinois Corporate Travel*, 889 F.2d at 752-53. Accordingly, the Seventh Circuit rejected the argument that travel agents' representation of multiple carriers means that they are not true sales agents for purposes of the antitrust laws. *Id.*

> ## 2. Because a Monopolist May Lawfully Charge a Monopoly Price, an Airline's Refusal to Allow Hidden City "Discounts" Cannot Be Exclusionary Conduct.

According to plaintiffs, "passengers seek and use hidden city tickets specifically to reduce the price they pay for air service to or from an airline's hub." Plaintiffs' Brief in Opposition to the Airline Defendants' Motion for Summary Judgment at 38. By having or enforcing a hidden city rule, an airline refuses to sell (whether through its employees or its agents) hub-spoke carriage at a fare it has not authorized for that itinerary. If an airline in fact monopolizes a route, it may lawfully charge whatever fare the market will bear for its services, even if that is a monopoly price. *Trinko*, 540 U.S. at 407. It necessarily follows that an airline's refusal to allow a purchaser to pay a price lower than the alleged monopoly price cannot violate Section 2. If a monopolist may lawfully charge as high a price as it likes, then it can certainly refuse to sell its services at a discounted or lower price.

It makes no difference if, as plaintiffs claim, some or all airlines once deliberately allowed travel agents to sell hidden city tickets, notwithstanding published tariff rules purporting to prohibit that practice. If airlines once allowed or even encouraged their agents to engage in hidden city ticketing as some functional discount on the hub-spoke fare, then enforcing a hidden-city rule simply eliminates a price discount once made available by the airline. *See, e.g.,* Plaintiffs' Summary Judgment Response at 40 (contending that hidden city tickets are price discounts). Like any other business, an airline has the right to increase the price for its services to whatever level the market will bear, whenever it chooses to do so. Eliminating a previously available discount cannot be any more illegal than simply charging the higher price in the first place. And charging a monopoly price is not only *not* illegal, it "is an important element of the free-market system." *Trinko*, 540 U.S. at 407; *Lerma v. Univision Communications, Inc.*, 52 F.Supp. 2d 1011, 1020 (E.D. Wis. 1999) ("A monopolist has no duty to reduce its prices or keep them low in order to help consumers.").

Nor does the validity of this point depend on whether the published hub-spoke fares are competitive. The Court posited in its summary judgment order that whether airlines may "close the hidden city 'loophole' in their fare structures" may depend on whether "hub-spoke fares are determined by competitive forces" (as defendants contend) or "are the product of supracompetitve hub premiums" (as plaintiffs contend). Order at 81-82. But a monopolist may lawfully raise all of its prices to monopoly levels even though, by definition, a monopoly price is not "determined by competitive forces." Closing a "loophole" in an airline's fare structure is no different than discontinuing a previously offered discount or simply raising all fares. Since a monopolist can lawfully charge monopoly prices in the first place, it can lawfully raise all of its

prices to a monopoly level or eliminate discounts or exceptions to its monopoly prices.[7]

### 3.   The Vertical Restraint Caselaw Does Not Support Plaintiffs' Position.

In holding that restrictions by an airline on the sale of its own tickets by travel agents could constitute exclusionary conduct, the Court drew an analogy to the case law involving vertical restraints under Section 1. Order at 74. However, these cases apply only where there is intrabrand competition, *i.e.*, at least one independent reseller that has purchased the branded products for its own account and is therefore authorized to resell them at a price of its choosing. "[T]he prohibition on resale price maintenance or other vertical restraints rests in part on the notion that the independent dealer should be an independent economic actor with respect to certain decisions, a notion that is simply inapposite where there are no independent dealers." 3A Areeda & Hovenkamp, at 43; *see also* cases cited at note 5, establishing that there is no intrabrand competition between principals and sales agents. Here there is only one seller of any given airline's tickets – the airline. Travel agents (like the carrier's own ticket agents) simply bind that carrier to ticket sale transactions with its customers.

Because Section 1 was intended to preclude the collaboration of competitors, it proscribes many categories of conduct that are perfectly lawful for a single firm, even conduct that unreasonably restrains trade. *See Copperweld*, 467 U.S. at 775.[8] Thus, the definition of

---

[7] In *Trinko*, the Supreme Court emphasized that, unlike certain telecommunications provisions, "Section 2 of the Sherman Act, by contrast, seeks merely to prevent *unlawful monopolization*. It would be a serious mistake to conflate the two goals. The Sherman Act is indeed the 'Magna Carta of free enterprise, but it does not give judges *carte blanche* to insist that a monopolist alter its way of doing business whenever some other approach might yield greater competition." 540 U.S. at 415-16 (emphasis in original) (internal citation omitted).

[8] "Because the Sherman Act does not prohibit unreasonable restraints of trade as such – but only restraints effected by a contract, combination, or conspiracy – it leaves untouched a single firm's anticompetitive conduct (short of threatened monopolization) that may be

Footnote continued on next page …

anticompetitive conduct for purposes of Section 2 should not be dictated by Section 1 case law. *See* 3A Areeda & Hovenkamp, at 47 ("[T]he anticompetitive consequences that would warrant § 1 condemnation [of resale price maintenance or vertical territorial and customer restrictions] do not involve the kind of 'exclusionary' effects that are the primary concern of § 2."). Indeed, defendants cannot find any case applying the law of vertical restraints to a claim brought under Section 2. In particular, *Graphic Products Distributors, Inc. v. Itek Corp.*, 717 F.2d 1560 (11th Cir. 1988) involved a Section 1 claim asserting that a manufacturer's use of exclusive territories restricted competition among independent distributors who purchased and resold the manufacturer's products at prices set by the distributors. *Id.* at 1564. *Itek* recognizes, as do virtually all of the vertical restraint cases, that restraints on intrabrand competition can under some circumstances violate Section 1. *Id.* at 1571-73. But that principle is not implicated here because, for purposes of the antitrust laws, there is no more intrabrand competition between an airline and travel agents than between an airline and its employees. *Supra*, pp. 5-6. Unlike the territorial restrictions on independent distributors at issue in *Itek*, the rules and restrictions that a principal places on its sales agent – even those directly affecting price – are not tested even under the rule of reason, because there is no agreement between competitors.[9]

### 4.    The Vertical Integration Cases Do Not Support Plaintiffs' Position.

The cases regarding vertical integration also do not sustain plaintiffs' position. Requiring a sales agent to sell only at the price and on the terms and conditions specified by the principal is

---

Footnote continued from previous page …

indistinguishable in economic effect from the conduct of two firms subject to § 1 liability." 467 U.S. at 775.

[9] If restraints on pure sales agents were reviewed under the rule of reason, then each of the cases rejecting vertical price-fixing claims based on the distinction between independent distributors and sales agents would have gone on to analyze the arrangement under the rule of reason, instead of simply holding that the defendant was entitled to judgment as a matter of law.

not vertical integration because, within the scope of the agency, the antitrust laws treat a sales agent and its principal as a single entity. *Supra*, pp. 5-6, 8-9. Thus, a firm that sells its products through sales agents, instead of distributors, is already vertically integrated, at least with respect to the prices, terms and conditions on which its goods are sold to consumers. That is why replacing independent dealers with sales agents constitutes vertical integration. *See, e.g., Paschall v. Kansas City Star Co.*, 727 F.2d 692 (8th Cir. 1984).

Plaintiffs do not claim that Delta or Northwest have violated Section 2 by using sales agents and employees, rather than independent resellers, to sell their tickets. Nor is there any evidence that fares would be lower if travel agents purchased and resold tickets, instead of acting merely as sales agents. Instead, plaintiffs complain that neither Delta nor Northwest allows travel agents to sell its services at a different fare than the one it set for travel between the hub and spoke at issue. But that is simply a function of the antitrust rule set forth in *General Electric* allowing a principal to dictate the exact price and terms at which its sales agents may sell its goods and services. That rule necessarily applies even if the principal insists on a monopoly price, since it is lawful to charge a monopoly price. *Trinko*, 540 U.S. at 407.

The Court suggested that, if the defendants were correct, then "a fully vertically-integrated monopolist would be wholly immunized from § 2 liability for any actions it might take within its monopolized market that threaten consumer welfare." Order at 82. However, the defendants' position does not change the settled law in any respect. No monopolist, whether "fully vertically-integrated" or not, may engage in conduct "that prevents actual or potential rivals from competing or which impairs their opportunities to do so effectively" and which meets the other tests for anticompetitive conduct set forth in *Aspen Skiing*, 472 U.S. at 605. 3 Areeda & Hovenkamp, at 78. But any monopolist may lawfully charge whatever price it chooses,

14

including a monopoly price. *Trinko*, 540 U.S. at 407. And any firm, whether a monopolist or not, may lawfully dictate the prices, terms and conditions at which its agents sell its goods and services. *See General Electric*, 272 U.S. at 488 and other authorities cited at pp. 5-7, *supra*.

### III.   HIDDEN CITY RULES CANNOT CONSTITUTE EXCLUSIONARY CONDUCT ON THE THEORY THAT THEY PRECLUDE INTERBRAND COMPETITION.

####   A.   Monopoly Leveraging.

#####   1.   Leveraging from Spoke-Hub to Spoke-Spoke Markets.

At oral argument, plaintiffs suggested that "an Airline's supracompetitive pricing on its allegedly monopolized hub-spoke route could operate to subsidize its pricing on its competitive spoke-spoke routes." Order at 83. After the Court's summary judgment decision, however, the Supreme Court decided *Trinko*, which confirms that such a claim would require proof of, among other things, "a 'dangerous probability of success' in monopolizing a second market." 540 U.S. at 415 n.4 (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993)). The portion of *Kerasotes Michigan Theatres, Inc. v. National Amusements, Inc.*, 854 F.2d 135 (6th Cir. 1988) that held otherwise is no longer good law.[10]

Plaintiffs have never argued that any defendant has a dangerous probability of monopolizing (or has monopolized) any *spoke-spoke* market; nor have plaintiffs sought discovery or introduced any evidence to that effect. Indeed, their theory is not that spoke-spoke routes are in any danger of being monopolized, but that such routes are *highly competitive*, thus

---

[10] *Compare Kerasotes*, 854 F.2d at 137 ("To run afoul of the antitrust laws, it is not necessary that the party attempting to leverage its monopoly power from a given market into a second market possess monopoly power or dominant market position in that second market.") with *Trinko*, 540 U.S. at 414 n.4. Indeed, this part of *Kerasotes* was implicitly overruled in *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993). *See, e.g.*, *Compuware Corp. v. IBM*, 259 F.Supp. 2d 597, 602-03 (E.D. Mich. 2002).

constituting appropriate benchmarks for determining what the competitive price would be on hub-spoke routes in the absence of the hidden city rules.[11]   On summary judgment, defendants argued there was no evidence that rules prohibiting hidden city ticketing exclude interbrand competition, and supported this point with, among other things, the testimony of plaintiffs' own expert.  *See* Beyer Dep. at 60.  Plaintiffs cannot withstand summary judgment by simply positing a factual claim with no evidence, particularly one that is squarely contrary to their theory of the case.  *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).[12]

In addition, *Trinko* established that a monopoly leveraging claim requires proof of some underlying exclusionary conduct.  540 U.S. at 415 n.4 ("In any event, leveraging presupposes anticompetitive conduct, which in this case could only be the refusal-to-deal claim we have rejected.").  Thus, allegations of monopoly leveraging cannot themselves satisfy plaintiffs' burden to prove exclusionary conduct.  The plaintiffs have offered no proof that Northwest or Delta have done or could do anything to exclude competitors from spoke-spoke routes.  Indeed, plaintiffs claim that this is not possible because airlines can serve spoke-spoke routes through a variety of hubs.  Beyer Aff. (2/28/2000) ¶ 18.  Moreover, even by plaintiffs' reasoning, there is no reason to think that Delta or Northwest would have any advantage in any spoke-spoke market

---

[11]  Beyer Aff. (2/28/2000), ¶ 18 ("Fares in spoke-to-spoke markets are competitive because travelers in these markets are largely indifferent as to which hub airport they connect through, and are willing to purchase tickets on any of a number of airlines providing air service to the same city pair."); *see also* Plaintiffs' Memorandum in Further Support of Plaintiffs' Motion for Class Certification (12/20/2000) at 21 ("Both Plaintiffs and Defendants are in agreement that the spoke-to-spoke fares are set by competition.").

[12]  This theory is not set out in the complaint, nor was it investigated or pursued by plaintiffs during discovery.  Instead, it was advanced for the first time at oral argument.

over any other carrier that also had a hidden city rule.[13]

## 2. Leveraging from Spoke-Hub to Spoke-Spoke to Spoke-Hub.

Nor can a hidden city rule constitute exclusionary conduct based on the possibility that "an Airline's monopoly leveraging on its spoke-spoke routes might also serve to further enhance its dominant position at its hub airport." Order at 84-85. First, as described by the Court, this theory supposes an initial leveraging into spoke-spoke routes. *Id.* However, plaintiffs have offered no evidence showing that such leveraging has even occurred, let alone that it has succeeded in bolstering Northwest's or Delta's position on any spoke-spoke route. Nor is there any prospect that plaintiffs can now do so since discovery has now long been closed, as has the opportunity to offer new theories through their expert.

Second, defendants cannot find any legal authority holding that subsidization of less profitable markets with profits from more profitable markets could constitute exclusionary conduct in the absence of proof of predatory pricing in the subsidized market. But predatory pricing requires proof both that defendant's prices are below an appropriate measure of defendant's costs and that the defendant has a dangerous probability of recouping the investment. *Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, Case No. 00-71535, March 31, 2003 Order, at 17-18. Plaintiffs have not remotely offered evidence that could satisfy the stringent legal requirements for this "'rarely successful'" claim. *Id.* at 18 (quoting *Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 226-27 (1993)).

---

[13] Also, plaintiffs represent a class of those who purchased hub-spoke tickets, not spoke-spoke tickets. Even if there were some viable claim that Delta or Northwest had monopolized a spoke-spoke market as a result of its hidden city rule, the injury would be suffered by those who purchased spoke-spoke tickets, not hub-spoke tickets. The class members are not "consumer[s], customer[s], competitor[s] or participant[s]" in the spoke-spoke markets and thus would have no standing to assert that hidden city rules have somehow impaired competition in these markets. *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1087 (6th Cir. 1983).

### 3.      Price Discrimination.

This Court stated that "vertical integration is not per se unlawful, but . . . may be deemed so where it 'facilitates price discrimination so that the monopolist can reap the maximum monopoly profit from different consumers.'"  Order at 85 (quoting *Byars v. Bluff City News Co.*, 609 F.2d 843, 861 (6th Cir. 1978)).  However, as noted above, a rule requiring a sales agent to sell only at the price and on the terms and conditions specified by the principal (as opposed to replacing independent distributors with sales agents) is not vertical integration.  A hidden city rule is just one example of such a rule.

In *Byars*, the allegedly exclusionary conduct was the defendant's termination and refusal to sell its goods to a small retailer, which had the effect of vertically integrating the defendant's downstream distribution.  Subsequent Sixth Circuit law clarifies *Byars*:

> Even a monopolist can decline to deal with a party who refuses to meet its standard terms and conditions for doing business.  In *Daily Press, Inc. v. United Press International*, 412 F.2d 126 (1969), we held that mere refusal to deal with one who is not a competitor does not constitute an antitrust violation.  As Blue Cross notes, *Byars v. Bluff City News Co.*, 609 F.2d 843 (6th Cir. 1978), upon which Glen Eden relies is distinguishable.  The plaintiff in *Byars* was a competitor as well as a customer of the defendant who refused to deal.

*Glen Eden Hosp., Inc. v. Blue Cross & Blue Shield of Michigan, Inc.*, 740 F.2d 423, 430 (6th Cir. 1984).  Thus, even if an airline is a monopolist, *Byars* would not require it to deal in any particular fashion with its sales agents (since they are not competitors) or preclude it from enforcing its "standard terms and conditions for doing business," *i.e.*, its tariff rules.  *Id.*

Moreover, the *Byars* dictum regarding price discrimination did not say that discrimination in sales to consumers can *itself* constitute exclusionary conduct, nor can the defendants find any other case standing for that proposition.  If, as is clearly the law, a monopolist may lawfully charge a monopoly price in a market that it dominates, then it cannot be illegal for a monopolist to charge a higher price in markets that it purportedly dominates than

in markets that it does not.  If it is lawful to charge all customers a monopoly price, then charging fewer than all customers a monopoly price cannot violate Section 2.  Charging different prices to different customers cannot preclude other firms from competing for those customers (unless, perhaps, the lower price was predatory, which plaintiffs do not attempt to prove here).

Indeed, Professors Areeda and Hovenkamp describe price discrimination by airlines, even among different classes of passengers flying between the *same* origin and destination, as a paradigmatic example of price discrimination that does not violate Section 2 because it has nothing to do with market power.  Areeda & Hovenkamp, 2A Antitrust Law § 517, at 133-34 ("[A]irlines' almost universally strategy of price discrimination, quite apart from any market power that they may have.  As a result, one cannot infer significant market power from this type of price discrimination, even though the discrimination itself is persistent and quite substantial in that the highest-price ticket may be two or three times higher than the lowest-price ticket offering the same services.").

## IV.   CONCLUSION

For the reasons set forth above, defendants respectfully request that the Court grant summary judgment in favor of defendants as to plaintiffs' Section 2 claims.

Respectfully submitted, this 29th day of April, 2005,

DICKINSON WRIGHT PLLC

By:   S/Brian M. Akkashian
    Lawrence G. Campbell (P11553)
    Brian M. Akkashian (P55544)
500 Woodward Avenue, Suite 4000
Detroit, MI  48226
(313) 223-3500
Attorneys for Defendants
Northwest Airlines Corporation and
Northwest Airlines, Inc.

James P. Denvir
Scott E. Gant
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W., Suite 800
Washington, D.C.  20015
(202) 237-2727
Attorneys for Defendants
Northwest Airlines Corporation and
Northwest Airlines, Inc.

19

Emmet J. Bondurant
Frank M. Lowrey IV
BONDURANT MIXSON & ELMORE LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, GA  30309
(404) 881-4100
Attorneys for Defendant Delta Air Lines, Inc.

David A. Ettinger
Howard Iwrey
HONIGMAN   MILLER   SCHWARTZ   &
COHN
2290 First National Building
Detroit, MI  48226
(313) 465-7368
Attorneys for Defendant Delta Air Lines, Inc.

DETROIT 22270-11 874375v1